**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**HARRISONBURG DIVISION**

**CRISTOBAL JUAREZ,**
    **Plaintiff**

**v.**                            **Case No.** 5:22-cv-43

**EXECUTIVE AUTO LLC,**
**and**
**WESTERN FUNDING II INC.**
**d/b/a Western Funding, Inc.,**
    **Defendants**


SERVE:
Executive Auto, LLC                  Western Funding II Inc.
R/A Shahram Hossein Khan Arbab    R/A Corporate Creations Network Inc.
699 N. Loudoun St.                 425 W Washington St Suite 4
Winchester, VA 22601             Suffolk, VA 23434-5320

## COMPLAINT

### Introduction

This action arises out of the sale of a 2007 Ford Truck F150 in Winchester, Virginia by Defendant Executive Auto, LLC (hereinafter "Executive Auto") in June 2019 to Plaintiff, a citizen of Virginia, and the sale's subsequent assignment to Western Funding II Inc. d/b/a Western Funding, Inc. (hereinafter "Western Funding"). The plaintiff brings federal claims under the Truth in Lending Act and the FTC Holder Rule against Defendant Western Funding that arise out of the aforementioned sale. This Court has jurisdiction over Plaintiff's federal question claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1640(e).

Plaintiff also brings supplemental state and common law claims, pursuant to 28 U.S.C. § 1367, for violation of the Virginia Consumer Protection Act ("VCPA"), Va. Code § 59.1-201, et seq., as well as fraud and constructive fraud against both Defendants.

Plaintiff states as follows:

**Facts**

1.          Plaintiff Cristobal Juarez (hereinafter "Juarez") is a natural person who resides at 1702 Fairfax Pike, White Post, VA 22663.

2.          Executive Auto is a Virginia Limited Liability Company and licensed automobile dealership with its principal place of business located at 699 N. Loudoun St, Winchester, VA 22601.

3.          Western Funding operates as a stock corporation with its principal office situated in Las Vegas. It possesses a legal and active presence in Virginia.

4.          Western Funding offers automotive and other credit financing in the Commonwealth of Virginia, and it has a working relationship with Executive Auto as the assignee of retail installment contracts made with consumers and purchasers of vehicles sold by Executive Auto.

5.          Executive Auto sold a 2007 Ford Truck F150 Supercrew Lariat, VIN 1FTPW14V47KA45949 (hereinafter "Ford"), to Plaintiff on June 3, 2019. *See* Plt. Exh. 1, Certificate of Title and Registration.

6.          All negotiations relating to this sale occurred at Executive Auto's principal place of business on June 3, 2019 in the city of Winchester, Virginia, making this Court the proper venue to bring this action.

7.          Plaintiff took delivery of the Ford on June 3, 2019.

8.          All of Plaintiff's interactions and negotiations with Executive Auto occurred in person and involved the same authorized representative and agent of Executive Auto: Hatef Kandi (hereinafter referred to as "Kandi").

9.      All of Western Funding's purported disclosures of credit terms to Plaintiff concerning the transaction were made on June 17, 2019.

10.     Plaintiff did not find out, nor could he have found out, about the purported disclosures of credit terms until October 2021 at the earliest.

<u>Facts</u>

11.     Plaintiff shopped for a used vehicle on June 3, 2019, and after seeing the Ford, bought it for a sales price of $12,350.00 as reflected on the Buyer's Order, signed by both Juarez and Kandi. *See* Plt. Exh. 2, Buyer's Order.

12.     The Buyer's Order was dated 6/3/2019; so too dated were the Certificate of Title and Registration, (*see* Plt. Exh. 1), the Odometer Disclosure Statement (*see* Plt. Exh. 3), an Agreement to Arbitrate (*see* Plt. Exh. 4), the Buyer's Guide (*see* Plt. Exh. 5), and numerous time-stamped documents faxed to Executive Auto as part of the dealership's assessment of Juarez's creditworthiness (*see* Plt. Exh. 6A-6R).

13.     In all respects, the sale of the Ford was treated as final on 6/3/2019, so much so that a Re-Assignment by Dealer of Title (*see* Plt. Exh. 7) was issued by and signed on behalf of Executive Auto. Both the Re-Assignment of Title and the Certificate of Title and Registration noted Western Funding as the lien holder of the Ford sold on 6/3/2019. *See id.*; *see also* Plt. Exh. 1.

14.     Executive Auto filled in the following information on Pages 1 and 2 of the Certificate of Title and Registration:

Sales Price:          $12,350.00

Date of First Lien:   06/03/2019

Lienholder Name:      Western Funding Inc.

Processing Fee:      $295.00

Sales Tax:           $524.77.

Executive Auto, in the course of handing documents to Juarez to close the transaction, obtained

Juarez's signature, above which appeared a certification that all information presented in the

form was true and correct under penalty of perjury. *See* Plt. Exh. 1, p. 1 and page 2.

15.     According to the Buyer's Order, Juarez paid a nonrefundable deposit of

$3,300.00. The Buyer's Order bears both Juarez and Kandi's signatures, respectively, below the

following statement:

> I have read and accept the terms and conditions of this Buyers Order, including those that
> appear on the reverse side, and hereby and acknowledge that this Buyers Order is
> complete and accurately reflects the agreements between the dealership and myself. I
> further acknowledge receipt of a copy of this Buyer's Order. THIS ORDER
> COMPROMISES [sic, should read "comprises"] THE ENTIRE AGREEMENT
> AFFECTING THE PURCHASE. *See* Plt. Exh. 2.

16.     The unpaid balance due, according to the Buyer's Order, equaled $9,928.77.

17.     On June 3, 2019, Plaintiff, upon request of Executive Auto, submitted a number

of date-stamped documents relating to his application for credit, including bank statements, pay

stubs, and a utility bill. Plaintiff also submitted, upon Executive Auto's request, proof of

insurance.

18.     Plaintiff signed a Spot Delivery Agreement dated 6/3/2019 in which Executive

Auto promised to notify him in zero days if the Retail Installment Contract was not assigned to a

third party. *See* Plt. Exh. 8.

19.     Executive Auto did not in fact obtain third party financing for the sale of the Ford

until 6/17/2019, or 14 days after they promised to "assign the Retail Installment Contract to a

third party within zero days." *See* id.

20.     At no point did Executive Auto request, or Plaintiff sign, an authorization for

Executive Auto to electronically sign documents for Plaintiff.

21.    Plaintiff did not receive any additional documents relating to the sale of,
or disclosures from, Western Funding for the financing of Ford until the end of 2021.

22.    From the evening of June 3, 2019 to June 17, 2019, Executive Auto and Western
Funding failed to disclose any material facts regarding the financing terms of the Ford to
Plaintiff.

23.    Indeed, Plaintiff made payments to Western Funding from July 2019 to August
2021 per the terms of a contract that Plaintiff never saw, nor signed, nor negotiated for—and yet
was bound to by the choices of Executive Auto and Western Funding.

24.    Thus, on June 3rd, 2019, Plaintiff's role in the transaction involving his own
vehicle concluded. What occurred thereafter must be pieced together by a series of documents
prepared by either Executive Auto or Western Funding—then traded between Defendants—
without the knowledge of or participation by Plaintiff.

25.    Executive Auto prepared (without consent of Plaintiff) an electronically forged
credit application dated 6/17/2019. A copy of this document was created at 1:57 PM. *See* Plt.
Exh. 9, Page 4 of 5. Pages 1-3 of this document were missing from Executive Auto's records of
the transaction.

26.    At no point on June 3rd (or any time after) did Plaintiff receive the actual
disclosures that formed the basis for the deal he agreed to on June 3, 2019 for the purchase of the
Ford: specifically, Executive Auto did not in any way disclose the true amount financed, the term
for the financing, or the percentage rate charged during the term financed.

27.    Similarly, Western Funding made no disclosures regarding the terms of its

financing to Plaintiff, nor did Western Funding make any apparent disclosures of its third-party financing to Executive Auto until June 17, 2019.

28.     The electronically forged credit application dated June 17, 2019 represents the sales price of the Ford as $13,000.00 and the amount financed as $11,515.74 at an interest rate of 24.99 for a term of 57 months. *See id.* at page 5 of 5. Plaintiff never saw the contents of this document, nor was he anywhere in the vicinity of Executive Auto's location at the date and time Executive Auto created it.

29.     The sales tax, which Executive Auto collected and submitted to the Virginia Department of Motor Vehicles, changed from $524.77 on the original documents signed on 6/3/2019 to $551.74 on 6/17/2019. *See* Plt. Exh. 10, Bill of Sale/Buyer's Order. Upon information and belief, Executive Auto did not inform the Commonwealth of Virginia of this change, nor did Kandi disclose information concerning the additional sales tax due from Plaintiff.

30.     Executive Auto, in concert with Western Funding, prepared an electronic "Retail Installment Contract and Security Agreement" dated 6/17/2019 that sets forth the following deal terms:

        a.  Annual percentage rate of 24.99 per cent;
        b.  Term of 57 months;
        c.  Monthly payment of $347.95;
        d.  Finance charges of $8,317.41;
        e.  Amount financed of $11,515.74;
        f.  Total of payments of $19,833.15 plus supposed down payment of $2,400.00;
        g.  Total cost of purchase of $22,233.15. *See* Plt. Exh. 11.

31.     Executive Auto placed Plaintiff's e-signature on page 3 of 6 of the Retail Installment Contract and Security Agreement dated 6/17/2019 without Plaintiff's approval. *See id.* at p. 3.

32.      Page 5 of the Retail Installment Contract and Security Agreement clearly stated that Western Funding was bound by all claims and defenses that could be raised by Plaintiff; specifically, in bold letters, it stated:

> NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER. *See id.*

33.      The contract and security agreement set forth in the Retail Installment Contract and Security Agreement was officially assigned to Western Funding by means of Kandi's e-signature at 1:55:05 PM Pacific Time on June 17, 2019. *See id.*

34.      Executive Auto created (and submitted to Western Funding) a full set of electronically created deal documents on June 17, 2019, including another Odometer Disclosure Statement, a Bill of Sale/Buyer's Order, a First Payment Notice shared by Western Funding, Agreement to Provide Insurance, and related deal documents. *See* Plt. Exh. 12, 10, 13 and 14.

35.      Western Funding and/or Executive Auto created a Deal Jacket dated 6/17/2019 that refers to "Christopher Salazar" and states:

> Approved! Your upfront check is $9,240.00. You can earn an additional $1,911.00 on this deal, to be paid on performance. Please remember to transfer the GPS device and submit the customer authorization form to Western Funding so this deal can be funded.

*See* Plt. Exh. 15.

36.      On 6/18/2019, Western Funding sent a "Funding Notification" message to

Executive Auto in which it sent a request for a "copy of the title (front and back) and lien receipt or title registration to Titles Department for funds to be released." *See* Plt. Exh. 16.

37.     Upon information and belief, Executive Auto sent Western Funding the original title (signed on 6/3/2019) and the original registration (signed on 6/3/2019). Western Funding accepted the original documents that bore the earlier dates without question. *See* Plt. Exh. 1 (original Certificate of Title and Registration).

38.     Western Funding accepted, without objection, that the true sales price of the Ford as reported to the Commonwealth of Virginia was $12,350.00 and the date of sale was 6/3/2019.

39.      Nowhere in the Spot Delivery Agreement did it state that the vehicle was delivered conditionally in all-caps.

40.     Moreover, Kandi did not explain to Plaintiff that the sale of the Ford was conditional on obtaining financing at some future date.

41.     At no point did Kandi explain that the document titled "Spot Delivery Agreement" imposes a condition precedent to creating a final contract to take ownership of the Ford; instead, he pointed at the signature line on the Spot Delivery Agreement and told Plaintiff to "sign here" in a cursory manner.

42.     After leaving the dealership, Plaintiff took the Ford home, thinking that he had purchased the vehicle under the terms laid out in ¶¶ 11, 14, 15 and 16.

43.     Plaintiff drove the Ford and made payments to Western Funding throughout 2019, 2020 and 2021.

44.     Plaintiff often experienced difficulty communicating with Western Funding on account of speaking English as a second language.

45.     On several occasions in 2021, Plaintiff attempted to make payments over the

phone to Western Funding. On at least three occasions, he called Western Funding, and provided

verbal authorization for his son to provide bank details to Western Funding, but Western

Funding refused to speak to Plaintiff's son or to accept payment orally through Plaintiff's son.

46.     Plaintiff also asked Western Funding to explain why the total amount owing on

the Ford was not decreasing even after two years' of making payments. Upon information and

belief, Western Funding said words to the effect that Plaintiff "got what he bargained for" and/or

"Plaintiff had no right to complain."

47.     Plaintiff lost work for a period of time in the summer of July 2021 and struggled

to make payments to Western Funding thereafter.

48.     On August 26, 2021, Western Funding sent Plaintiff a default notice in which it

set forth the following:

     a.   Amount due:          $696.60;

     b.   Balance due:          $10,188.01;

     c.   Method for paying:    (money gram wire transfer, using code 1565).

*See* Plt. Exh. 17.

49.     Plaintiff tried to arrange for payment over the phone but could not get Western

Funding to accept his offers to pay—partly due to language barriers, and partly due to Western

Funding's internal policies and controls (or lack thereof) for communicating with Spanish-

speaking clients.

50.     Western Funding repossessed the Ford on 9/17/2021 and conducted a sale of the

vehicle on 9/30/2021.

51.     According to correspondence mailed from Western Funding to Plaintiff on

10/29/2021, the private sale yielded $3,984.00 out of a total owed of $10,547.93, which left a total deficiency of $6,978.93. *See* Plt. Exh. 18.

52.     Confused as to how he had borrowed less than $10,000.00, made payments of approximately $347 a month for two years, yet owed more than $10,500.00, and also confused as to why the Ford had been repossessed despite his efforts to make payments right up until the Ford was towed away, Plaintiff visited Executive Auto and requested his original loan documents in October 2021.

53.     In response, Executive Auto provided one document, the "Dealer Track Plate & Auto Full List," which contained the following details:

| | |
|---|---|
| VIN | 1FTPW14V47KA45949 2007 FORD |
| Lien Established Date | 6/3/2019 |
| Lien Holder | Western Funding, Inc. |
| Purchase Price | $12,350.00 |
| Sales Tax | $524.77 |
| DMV Total | $591.52. |

*See* Plt. Exh. 19.

54.     Upon follow up questions from Plaintiff, Executive Auto claimed to possess no further records of the sale.

55.     Plaintiff still did not understand how he had paid $347.95 or more per month for more than two years but still had lost his truck. He experienced significant depression as a result of what he viewed as a humiliating experience. He also sought the help of legal counsel to understand why his truck had been repossessed.

56.     Counsel for Plaintiff followed up with a written request for documents pertaining to the purchase from Executive Auto of the Ford on November 17, 2021. Counsel for Executive Auto sent a full and complete response to this request via email on February 16, 2022.

57.     Plaintiff reviewed the documents pertinent to the purchase and financing

**Juarez Complaint Page 10 | 27**

of his Ford for the first time in February 2022, or almost two and a half years after he purchased, Executive Auto sold and assigned, the Retail Installment Contract to Western Funding.

58.        Plaintiff does not have an exact accounting of how much he paid to each Defendant. Nonetheless, the documents demonstrate that Plaintiff paid a down payment of $3,300.00 to Executive Auto.

59.        In addition, Plaintiff, upon information and belief, made payments of $347.95 for 24 months before Western Funding repossessed the Ford. These payments amount to $8,350.80.

60.        Upon information and belief, the total amount paid by Plaintiff to Defendants equals at least $11,650.80.

61.        Plaintiff still owes Western Funding $6,978.93 per the notice of sale and disposition of the Ford created by Western Funding on October 29, 2022.

## Claims for Relief

### First Cause of Action Against Executive Auto: Failure to Provide Notice and Failure to Secure Financing, Subject to Virginia Consumer Protection Act

62.        Paragraphs 1-61 of this Complaint are reiterated and incorporated herein.

63.        Executive Auto is a seller and Plaintiff is a customer under Va. Code §46.2-1500 et seq. and the transaction described heretofore is subject to the requirements concerning Buyer's Orders contained in Va. Code § 46.2-1530.

64.        Va. Code § 46.2-1530(A)(12) sets forth disclosures required when vehicles are delivered by dealers to customers conditional on dealer-arranged financing.

65.        The car delivered to Plaintiff under the "Spot Delivery Agreement" was delivered conditional on dealer-arranged financing.

66.        Executive Auto did not comply with the terms required for notice under Va.

Code § 46.2-1530(A)(12), which requires the following to appear in bold type no less than 10

point:

IF YOU ARE FINANCING THIS VEHICLE, PLEASE READ THIS NOTICE: YOU ARE
PROPOSING TO ENTER INTO A RETAIL INSTALLMENT SALES CONTRACT WITH
THE DEALER. PART OF YOUR CONTRACT INVOLVES FINANCING THE PURCHASE
OF YOUR VEHICLE. IF YOU ARE FINANCING THIS VEHICLE AND THE DEALER
INTENDS TO TRANSFER YOUR FINANCING TO A FINANCE PROVIDER SUCH AS A
BANK, CREDIT UNION OR OTHER LENDER, YOUR VEHICLE PURCHASE DEPENDS
ON THE FINANCE PROVIDER'S APPROVAL OF YOUR PROPOSED RETAIL
INSTALLMENT SALES CONTRACT. IF YOUR RETAIL INSTALLMENT SALES
CONTRACT IS APPROVED WITHOUT A CHANGE THAT INCREASES THE COST OR
RISK TO YOU OR THE DEALER, YOUR PURCHASE CANNOT BE CANCELLED. IF
YOUR RETAIL INSTALLMENT SALES CONTRACT IS NOT APPROVED, THE DEALER
WILL NOTIFY YOU VERBALLY OR IN WRITING. YOU CAN THEN DECIDE TO PAY
FOR THE VEHICLE IN SOME OTHER WAY OR YOU OR THE DEALER CAN CANCEL
YOUR PURCHASE. IF THE SALE IS CANCELLED, YOU NEED TO RETURN THE
VEHICLE TO THE DEALER WITHIN 24 HOURS OF VERBAL OR WRITTEN NOTICE IN
THE SAME CONDITION IT WAS GIVEN TO YOU, EXCEPT FOR NORMAL WEAR AND
TEAR. ANY DOWN PAYMENT OR TRADE-IN YOU GAVE THE DEALER WILL BE
RETURNED TO YOU. IF YOU DO NOT RETURN THE VEHICLE WITHIN 24 HOURS OF
VERBAL OR WRITTEN NOTICE OF CANCELLATION, THE DEALER MAY LOCATE
THE VEHICLE AND TAKE IT BACK WITHOUT FURTHER NOTICE TO YOU AS LONG
AS THE DEALER FOLLOWS THE LAW AND DOES NOT CAUSE A BREACH OF THE
PEACE WHEN TAKING THE VEHICLE BACK. IF THE DEALER DOES NOT RETURN
YOUR DOWN PAYMENT AND ANY TRADE-IN WHEN THE DEALER GETS THE
VEHICLE BACK IN THE SAME CONDITION IT WAS GIVEN TO YOU, EXCEPT FOR
NORMAL WEAR AND TEAR, THE DEALER MAY BE LIABLE TO YOU UNDER THE
VIRGINIA CONSUMER PROTECTION ACT.

67.        Executive Auto failed to secure the financing promised to Plaintiff within the

same day, as promised, and thus was required to give notice to Plaintiff as set forth in ¶ 17, 65.

68.        Executive Auto is a "supplier" and the transaction between Plaintiff and

Executive Auto is a "consumer transaction" as those terms are defined by the Virginia Consumer

Protection Act, Va. Code §59.1-196 et seq. (hereinafter referred to as "VCPA"), at § 59.1-198.

69.        Va. Code § 59.1-200(A)(14) makes it a "prohibited practice" under the VCPA to

use "any other deception, fraud, false pretense, false promise, or misrepresentation in connection

with a consumer transaction."

70.    Executive Auto did not in fact obtain financing as promised to Plaintiff; instead,

Executive Auto failed to notify Plaintiff of the change in or post-dated creation of financing

terms.

71.    At a minimum, Executive Auto engaged in a "deception, false pretense, false

promise, or misrepresentation" in connection with the sale of the Ford by, *inter alia*: not

obtaining the financing within the time promised in the Spot Delivery Agreement; by failing to

disclose the terms of the financing obtained; and by changing the sales price—all without

disclosing the changed terms until it was too late for Plaintiff to seek cancellation of the initial

transaction. *See* Va. Code § 59.1-200(A)(14).

72.    Plaintiff, a reasonable person, did not (nor could he have found out) about

the actions that give rise to this claim until his car was repossessed and he began to ask questions

of Executive Auto in October 2021.

73.    The VCPA provides for the recovery of actual damages or $500.00, whichever

is greater, or in the case of a willful violation, up to three times the actual damages or $1,000.00,

whichever is greater. Va. Code § 59.1-204(A). The VCPA also provides for the

award of reasonable attorney's fees and court costs. Va. Code §59.1-204(B).

74.    As a result of Executive Auto's switching of financial deals and deceptive

practices in relation to the so-called Spot Delivery Agreement, Plaintiff suffered actual damages

in the amount of $11,650.80 (amounts paid to Western Funding), plus $6,978.93 (amount still

owed to Western Funding), or $18,629.73, plus damages for emotional distress, and since

Executive Auto's action was willful, Plaintiff is entitled to treble relief in the amount of at least

$55,889.19, plus incidental and consequential damages, as well as reasonable attorney's fees

pursuant to Va. Code § 59.1-204.

## Plaintiff's Second Cause of Action against Executive Auto:

## Violation of the Virginia Consumer Protection Act, General Misrepresentations

75.    Paragraphs 1-74 of this Complaint are reiterated and incorporated herein.

76.    Executive Auto is a "supplier" and the transaction between Plaintiff and

Executive Auto is a "consumer transaction" as those terms are defined by the Virginia Consumer

Protection Act, Va. Code §59.1-196 et seq. (hereinafter referred to as "VCPA"), at § 59.1-198.

77.    Va. Code § 59.1-200(A)(14) makes it a "prohibited practice" under the VCPA to

use "any other deception, fraud, false pretense, false promise, or misrepresentation in connection

with a consumer transaction."

78.    Executive Auto violated the prohibition of Va. Code § 59.1-200(14) from using

any deception, fraud, false pretense, false promise, or misrepresentation in connection with a

consumer transaction by each, or by a combination of the following:

        a.  By submitting documents to the DMV stating that the sales price and sales

            tax of the vehicle were $12,350.00 and $524.77—then altering those

            amounts to $13,000.00 and $551.74 on documents sent to Western

            Funding;

        b.  By misrepresenting that the lien held by Western Funding had been

            created on 6/3/2019—again on documents sent to a state entity;

        c.  By stating on the Buyer's Order that it comprised the full agreement of the

            parties—and then submitting an entirely different agreement to Western

            Funding on 6/17/2019;

    d.   By forging or otherwise electronically creating Plaintiff's e-signatures on

a series of documents created on 6/17/2019;

    e.   By misrepresenting the amount of the down payment as $2,400.00;

    f.   By stating to Plaintiff in 2021 when asked for all documents relating to the

purchase of the Ford that the single sheet of paper, the "Dealer Track Plate

& Auto Full List" comprised the totality of the documents connected to

the transaction; and

    g.   By deceptively using a Spot Delivery Agreement that violates Virginia

law since it did not notify Plaintiff of his right to cancel the sale and get

his down payment back if the loan was not approved by a third-party

assignee and that failure to return said down payment could constitute a

violation of the VCPA.

(Collectively, the "Misrepresentations").

79.       Plaintiff, a reasonable person, did not (nor could he have found out) about

the actions that give rise to this claim until his car was repossessed and he began to ask questions

of Executive Auto in October 2021.

80.       The VCPA provides for the recovery of actual damages or $500.00, whichever

is greater for each violation, or in the case of a willful violation, up to three times the actual

damages or $1,000.00, whichever is greater. Va. Code § 59.1-204(A). The VCPA also provides

for the award of reasonable attorney's fees and court costs. Va. Code §59.1-204(B).

81.       Executive Auto committed these Misrepresentations deliberately and willfully.

82.       As a result of the Misrepresentations Plaintiff has suffered substantial actual

damages in the amount of $11,650.80 (amounts paid to Western Funding), plus $6,978.93

(amount still owed to Western Funding), or $18,629.73, plus damages for emotional distress, and

since Executive Auto's action was willful, Plaintiff is entitled to treble relief in the amount of at

least $55,889.19, plus incidental and consequential damages, as well as reasonable attorney's

fees pursuant to Va. Code § 59.1-204.

<strong><u>Plaintiff's Third Cause of Action against Executive Auto:</u></strong>

<strong><u>Fraud</u></strong>

83.        Paragraphs 1-82 of this Complaint are reiterated and incorporated herein.

84.        Executive Auto through agent Kandi made or caused the Misrepresentations

(defined above in ¶ 78) so that Plaintiff would sign the Buyer's Order and Spot Delivery

Agreement and be obligated to pay the amounts as set forth in the 6/17/2019 deal, which was

founded on forged electronic documents that set forth terms universally worse for the Plaintiff

than the terms disclosed to Plaintiff on the 3rd of June, 2019.

85.        At the time of the sale, Executive Auto intentionally misrepresented that it had

sold the Ford on the terms set forth in the original Buyer's Order when it did not have present

intent to honor this agreement, nor did it have intent to assign the financing terms to a creditor as

those terms were agreed to by Plaintiff, but made these promises in order to obtain Plaintiff's

agreement to buy the Ford.

86.        Plaintiff relied on Executive Auto's Misrepresentations by signing all the

documents presented to him by Executive Auto, by paying $3,300.00 as a down payment, by

taking the Ford home and thereafter, by paying Western Funding monthly amounts for the Ford

based on financing terms that were later created by Executive Auto without Plaintiff's consent.

87.        Executive Auto made these Misrepresentations so that on the one hand Plaintiff

would sign the Buyer's Order and be obligated to buy the vehicle and make payments on it, but on the other hand so that Executive Auto could switch to, by means of deceit, fraud, forgery and false pretense, a contract that contained terms that inured to Executive Auto's benefit while causing direct financial loss to Plaintiff.

88.     The Misrepresentations were material in nature insofar as they went to the length of the contract, the contract price, the interest rate, the taxes due, whether (and when) the financing obtained was actually or conditionally approved.

89.     Plaintiff was harmed by Executive Auto's Misrepresentations because he paid more for the vehicle, both as far as the agreed-to final purchase price, the down payment, the amount financed, as well as the entire security agreement later fraudulently created on Plaintiff's behalf and submitted with terms that created a monster of a loan for the Plaintiff.

90.     As a result of Executive Auto's multiple acts of fraud and/or misrepresentation, Plaintiff has suffered substantial actual damages from the increase in the financed amount for the vehicle in the amount of at least $11,650.80 (amounts paid to Western Funding), plus $6,978.93 (amount still owed to Western Funding), or $18,629.73, plus damages for emotional distress, aggravation, humiliation and distress. Plaintiff has suffered other substantial actual damages, including the repossession of the Ford, adverse effect on his credit score, loss of ownership of a vehicle, inconvenience, and other consequential and incidental damages that were reasonably foreseeable by Executive Auto.

91.     Indeed, the bold forgeries, alterations and sham financing agreement created by Executive Auto caused direct harm to Plaintiff and this harm, in all manner, shape and form, was reasonably foreseeable to Executive Auto.

92.     Plaintiff, a reasonable person, did not (nor could he have found out) about

the actions that give rise to this claim until his car was repossessed and he began to ask questions of Executive Auto in October 2021.

93.    Executive Auto knew that the misrepresentations, fraudulent statements and deceitful actions were false when it made them. It did so with actual and legal malice to Plaintiff and without regard to his rights and interests. Accordingly, Executive Auto is also liable to Plaintiff for punitive damages.

**Plaintiff's Fourth Cause of Action against Executive Auto and Western Funding:**

**Constructive Fraud**

94.    Paragraphs 1-93 of this Complaint are reiterated and incorporated herein.

95.    Executive Auto made the Misrepresentations (defined in ¶ 78) so that Plaintiff would be obligated to pay the amounts later set forth in the agreement formed by Executive Auto with consent of assignee Western Funding on 6/17/2019.

96.    Western Funding participated in the acts that constituted misrepresentations by:

a)    Funding a loan knowing that the lien had been established a full two weeks prior to funding;

b)    Providing incentives to Executive Auto in the form of the additional $1,911.00 to be earned by the dealership's adjustment of the sales price, the down payment, and other terms of the Buyer's Order;

c)    Requiring the submission of the credit application and the Buyer's Guide—which were both dated 6/3/2019;

d)    Accepting post-dated E-signed versions of the Bill of Sale, Odometer Statement, and Retail Installment Agreement, which on their face contradicted original documents such as the Certificate of Title and the

Registration that Western Funding should have—and was in fact legally

required to—examine as part of its duties as the assignee of the contract.

Collectively "Western Funding Misrepresentations."

97.     The Western Funding Misrepresentations as well as the Misrepresentations by

Executive Auto were material in nature insofar as they went to the length of the contract, the

contract price, the interest rate, and whether the financing obtained was actually or conditionally

approved; in addition, Western Funding ignored the numbers and dates on several documents

that went to the essence of the transaction.

98.     Executive Auto lacked present intent to perform as promised on

6/3/2019 because it made no attempt to obtain Plaintiff's signatures on the actual contract

assigned to Western Funding.

99.     Western Funding lacked present intent to perform per the terms set forth in the

Certificate of Title and the Original Odometer Statement, and further lacked present intent to

extend credit on terms to be disclosed to Plaintiff before the Plaintiff became obligated to

Western Funding on a forged electronic contract.

100.     Executive Auto and Western Funding participated in a scheme for

Western Funding to send an additional $1,911.00 to Executive Auto in exchange for Executive

Auto's assignment of a contract that obligated Plaintiff to pay an exorbitant $8,317.41 in

financing costs to Western Funding.

101.     Executive Auto and Western Funding participated in the sham transaction

on purpose and with the intent to obligate Plaintiff to make payments to Western Funding.

102.     Indeed, the forgeries, alterations, and changes to signed original contractual

papers made by Executive Auto and shared with Western Funding caused direct harm to Plaintiff

and this harm, in all manner, shape and form, was reasonably foreseeable to both Executive Auto

and Western Funding.

103.    Plaintiff relied on Executive Auto's Misrepresentations by signing all the

documents presented by Executive Auto on 6/3/2019 and by making a down payment of

$3,300.00.

104.    Plaintiff detrimentally relied on Western Funding's Misrepresentations by

making payments to the assignee of the sham transaction created on 6/17/2019 for more than two

years at a rate of $347.95 a month, for a total paid of at least $8,317.41.

105.    Executive Auto made these Misrepresentations so that on the one hand

Plaintiff would sign the 6/3/2019 documents and be obligated to buy the vehicle and make the

payments, but on the other hand Executive Auto could switch to an entirely new contract that

contained terms that inured to both Executive Auto and Western Funding's benefit while causing

direct financial harm to Plaintiff.

106.    Western Funding made its own Misrepresentations and knowingly accepted

Executive Auto's sham documents so that it could charge the Plaintiff more for the Ford via the

fake deal inked on 6/17/2019 and it did so with intent to take more money from the Plaintiff at

Plaintiff's loss.

107.    Plaintiff was harmed by both Executive Auto and Western Funding's

Misrepresentations because Plaintiff paid much more for the vehicle than he agreed to pay on

6/3/2019, and because he was denied his rights under the Spot Delivery Agreement to walk away

from the financing acquired from Western Funding that put him in an economically worse

position on the loan.

108.    Plaintiff also suffered harm because the exorbitant cost of the money borrowed from (and owed to) Western Funding resulted in Plaintiff's eventual inability to pay as required in the sham documents created on 6/17/2019.

109.    Plaintiff's harm is best summarized by the following: after he handed over a down payment of $3,300.00, he agreed to finance the remaining $9,928.77, yet after making regular payments of $347 or more per month (for a total of $11,650.80) to Western Funding, he still owed the co-Defendant more in September 2021 than he owed them on June 3, 2019—which benefited Western Funding to a degree that can well be considered unconscionable.

110.    As a result of Executive Auto and Western Funding's multiple acts of deceit, Plaintiff has suffered substantial actual damages from amounts paid to Executive Auto and Western Funding per the sham deal negotiated on 6/3/2019 and the even more egregiously sham deal created on 6/17/2019 in the amount of at least $11,650.80 (the $3,300.00 down payment plus the $8,317.41 in financing charges) plus aggravation, humiliation and emotional distress.

111.    Plaintiff has also suffered other substantial actual damages, including adverse effect on his credit rating, loss of ownership of a vehicle, inconvenience, and other consequential and incidental damages that were reasonably foreseeable to both Executive Auto and Western Funding.

112.    Plaintiff, a reasonable person, did not (nor could he have found out) about the actions that give rise to this claim until his car was repossessed and he began to ask questions of Executive Auto in October 2021.

113.    Plaintiff is entitled to punitive damages against Executive Auto and Western Funding.

**Plaintiff's Fifth Cause of Action against Western Funding: Truth in Lending Act**

**Violation for Failure to Disclose Terms of Credit Prior to Consummation of Deal**

114.        Paragraphs 1-113 of this Complaint are reiterated and incorporated herein.

115.        Western Funding is a "creditor" and Plaintiff is a consumer as

defined by 15 U.S.C. § 1602 of the Truth in Lending Act ("TILA") and the Retail Installment

Contract and Security Agreement assigned to Western Funding is a transaction governed by

TILA's disclosure and timing requirements. *See* 15 U.S.C. § 1601 et seq.

116.        Regulation Z as set forth in 12 C.F.R. Part 1026 and codified in 15 U.S.C. §

1600 et. seq. implements TILA's disclosure laws as the laws apply to TILA disclosures by

creditors such as Western Funding to consumers such as the Plaintiff.

117.        15 U.S.C. § 1638(b)(2) states that "[e]xcept as otherwise provided in this part, the

disclosures required under subsection (a) shall be made before the credit is extended."

118.        Similarly, § 1026.17(B)(2) of Regulation Z requires that information pertinent to

the amount financed, the interest rate, the term of the loan and related consumer rights under

TILA must be disclosed to consumer before the consumer signs an agreement that gives rise to

the consumer's obligations to the creditor.

119.        Western Funding did not supply Truth in Lending Disclosures in

any manner, shape or form to Plaintiff before Plaintiff applied for credit from Western Funding.

120.        Western Funding's fraudulent concealment of and participation in constructive

fraud with Executive Auto in all aspects of the transaction that enriched Defendants at Plaintiff's

expense by means of concealing the terms of the loan from Plaintiff equitably tolled the one-year

TILA statute of limitations.

121.        At no point did Plaintiff discover the true nature of the loan terms made to him

until after Western Funding repossessed the Ford at the end of September 2021.

122.     No reasonable person would have discovered the TILA violations pled above due to the fraudulent concealment by Western Funding, in conjunction with Executive Auto, of the loan terms that benefited Western Funding and Executive Auto at the expense of the Plaintiff.

123.      Western Funding knew or should have known that its own documents demonstrated that it obtained a lien on Plaintiff's property before it disclosed any financing terms to the Plaintiff. The date given on Western Funding's own paperwork indicates that it obtained a lien on 6/3/2019 but all disclosures pursuant to TILA occurred two full weeks later (6/17/2019).

124.      15 U.S.C. § 1640(a)(1) states that any creditor who fails to comply with any requirement imposed by the TILA is liable for "any actual damage sustained by such person as a result of the failure."

125.      15 U.S.C. §1640(a)(2(A)(i) states that the creditor is liable for twice the amount of any finance charge in connection with the transaction.

126.     Western Funding's TILA disclosure on 6/17/2019 provided for finance charges of $8,317.41, which doubled equals $16,634.82; thus, Western Funding is liable to Plaintiff in that amount.

127.     In the alternative, due to Western Funding's failure to provide disclosures prior to the consummation of the transaction on 6/17/2019, Plaintiff suffered actual damages of $11,650.80 plus $6,978.93 (amount still owed to Western Funding), or $18,629.73.

128.     15 U.S.C. §1640(a)(3) states that the creditor is liable for the costs of the action, together with a reasonable attorney's fee as determined by the court in any case successfully brought to enforce an action for failure to comply with any requirements, including that of disclosure prior to consummation, set forth in TILA.

129.     Western Funding is liable for the costs of this lawsuit, together with reasonable attorney's fees incurred to bring the action at hand.

**Plaintiff's Sixth Cause of Action against Western Funding: Strict Liability for VCPA Violations by Seller through Status as Assignee of Contract under FTC Holder Rule**

130.     Paragraphs 1-129 of this Complaint are reiterated and incorporated herein.

131.     Western Funding is an assignee of the Retail Installment Sales Agreement made by Executive Auto and Plaintiff.

132.     The Federal Trade Commission's "Holder Rule" provides that the holder of a consumer credit contract is subject to all claims the debtor (Plaintiff) can assert against the seller of goods. *See* 16 C.F.R. § 433.2.

133.     Page 5 of the Retail Installment Contract and Security Agreement clearly stated that Western Funding was bound by all claims and defenses that could be raised by Plaintiff.

134.     Virginia recognizes the applicability of the so-called FTC Holder in Due Course Rule to transactions such as the one by and between Plaintiff and Executive Auto, as well as the subsequent assignment of Executive Auto's rights and duties to Western Funding.

135.     The terms of the credit contract set forth Western Funding's liability to Plaintiff:

NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER. *See id.*

136.    Executive Auto is a "supplier" and the transaction between Plaintiff and Executive Auto is a "consumer transaction" as those terms are defined by the Virginia Consumer Protection Act, Va. Code §59.1-196 et seq. (hereinafter referred to as "VCPA"), at § 59.1-198.

137.    Va. Code § 59.1-200(A)(14) makes it a "prohibited practice" under the VCPA to use "any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

138.    Executive Auto made or caused the Misrepresentations (defined above in ¶ 78) so that Plaintiff would sign the Buyer's Order and Spot Delivery Agreement and be obligated to pay the amounts as set forth in the 6/17/2019 deal, to Assignee Western Funding.

139.    By the terms of the agreement assigned to Western Funding, in exchange for accepting payments for the Ford from Plaintiff, Western Funding agreed to finance the deal at hand and further agreed to be "subject to all claims and defenses which the debtor [Plaintiff] could assert against the seller 'Executive Auto.'

140.    Per the terms of this agreement, Plaintiff is entitled to recovery not to exceed amounts it paid, which in the case of Plaintiff's purchase of the Ford include, at least per the 6/17/2019 agreement, the following: a down payment of $2,400.00 (or in the alternative, the actual down payment of $3,300.00 per the terms of the 6/3/19 agreement) plus total financing in the amount of $8,317.41 (the monthly payment multiplied by 24 months), for a total of $10,717.41 or $11,617.41.

## Prayer for Relief

WHEREFORE, Plaintiff prays that this Court:

1.    Assume jurisdiction of this case;

2.    Award actual damages to Plaintiff from Executive Auto for each violation of

the VCPA in the amount of $18,629.73, plus damages for emotional distress, and since

Executive Auto's actions were willful, award Plaintiff treble damages in the amount of at least

$55,889.19 for each VCPA violation, plus incidental and consequential damages, as well as costs

and reasonable attorney's fees pursuant to Va. Code § 59.1-204.

3.      Award Plaintiff damages of $18,629.73, plus damages for emotional distress,

aggravation, and consequential damages from Executive Auto's commission of actual fraud

throughout the negotiations for the Ford, and also award punitive damages.

4.      Award Plaintiff damages of $18,629.73, plus damages for emotional distress,

aggravation, and consequential damages from Executive Auto and Western Funding for the

commission of constructive fraud in the transaction involving the Ford sold to Plaintiff, as well

as punitive damages.

5.      Determine that the one-year TILA statute of limitations was equitably tolled by

Western Funding's fraudulent concealment of the terms of its loan and award Plaintiff actual

damages of $16,634.82 (double the amount of finance charges) against Western Funding for the

violation of TILA's disclosure requirements, or, in the alternative, award Plaintiff $18,629.73 for

actual damages against Western Funding; and, in any case, award Plaintiff his costs and

reasonable attorney's fees.

6.      Determine that under the Holder Rule, Western bears strict liability for all VCPA

violations by Seller Executive Auto, and award Plaintiff damages of $10,717.41 or, in the

alternative, $11,617.41, or an amount equivalent to those amounts Debtor-Plaintiff paid under

the retail sales agreement, plus costs and attorney's fees due Plaintiff under Virginia Consumer

Protection Law for Seller Executive Auto's VCPA violations;

7.      Award such other relief as the Court deems appropriate.

TRIAL BY JURY IS DEMANDED.


                                    Respectfully Submitted,
                                    Cristobal Juarez


By Counsel:
        /s/
_____
Elaine L. Jarvis, Esq. (VSB #41623)
Counsel for Plaintiff
29 Crescent Street
Front Royal, VA 22630
Tel: 540 546-0220
Fax: 540 546-0229
elaine@jarvislaw.org