IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| CRISTOBAL JUAREZ,         ) | |
|         ) | |
|     Plaintiff,         ) | Case No. 5:22-cv-043 |
|         ) | |
| v.         ) | By:   Michael F. Urbanski |
|         ) | Chief United States District Judge |
| EXECUTIVE AUTO LLC, and    ) | |
| WESTERN FUNDING II INC, d/b/a  ) | |
| Western Funding, Inc.         ) | |
|         ) | |
|     Defendants.         ) | |

## MEMORANDUM OPINION

This matter comes before the court on plaintiff Cristobal Juarez's Motion for Default Judgment, ECF No. 44. For the reasons stated below, Juarez's motion is **GRANTED**.

### I.

This dispute centers around the purchase and financing of a 2007 Ford F-150 ("Ford"). In short summary, Plaintiff Cristobal Juarez ("Juarez") signed a spot purchase agreement and a buyer's order, among other documents, disclosing one set of terms from defendant Executive Auto LLC ("Executive Auto") on June 3, 2019, before driving home in the Ford. Executive Auto obtained financing from defendant Western Funding, Inc. ("Western Funding") on June 17, 2019, allegedly forging Juarez's signature on the loan application. Juarez was never informed of the financing agreement and made payments based on the terms to which he believed he had agreed. Juarez's attempts to remedy the situation were thwarted by language and institutional barriers between himself and the defendants. Western Funding ultimately re-possessed the Ford and sold it at auction.

1

## A. The Initial Purchase

Juarez, seeking to purchase a vehicle, visited Executive Auto's location in Winchester, Virginia on June 3, 2019. Compl., ECF No. 2, at ¶¶ 5–6, 11. While there, Juarez negotiated the purchase of the Ford with Executive Auto's authorized representative and agent, Hatef Kandi ("Kandi"). Id. at ¶¶ 6, 8. At the conclusion of his visit, Juarez drove the Ford home after signing numerous documents, among them a June 3 Buyer's Order, Ex. 2, ECF No. 2-2, at 4–6; Spot Delivery Agreement, Ex. 8, ECF No. 2-2, at 30; and Certificate of Title and Registration, Ex. 1, ECF No. 2-2, At 1–3.[1]

The June 3 Buyer's Order provides for a sale price of $12,360.00; processing fee of $295.00, total selling price of $12,645.00;[2] state sales tax of $524.77; and license, registration, and title fees of $59. Ex. 2, ECF No. 2-2, at 4. This sums to a total due of $13,228.77. Id. Less a down payment recorded as $3,300, Juarez's unpaid balance was listed as $9,928.77. Id. Both Juarez and Kandi signed the June 3 Buyer's Order below the following statement:

> I have read and accept the terms and conditions of this Buyers Order, including those that appear on the reverse side, and hereby and acknowledge that this Buyers Order is complete and accurately reflects the agreements between the dealership and myself. I further acknowledge receipt of a copy of this Buyer's

---

[1] Juarez signed numerous other documents on June 3, 2019: an Odometer Disclosure Statement, Ex. 3, ECF No. 2-2, at 7; an Agreement to Arbitrate, Ex. 4, ECF No. 2-2, at 8; a Buyer's Guide, Ex. 5, ECF No. 2-2, at 9–10; and a Re-Assignment of title by Virginia Motor Vehicle Dealer, Ex. 7, ECF No. 2-2, at 29. Juarez also provided various documents as proof of income and credit worthiness. Ex. 6, ECF No. 2-2, at 11–28. Several of these documents refer to Western Funding as the lienholder or assign the title to Western Funding, despite the absence of a financing agreement as of this date.

[2] The sum of $12,360.00 and $295.00 is $12,655.00. Apparently, an arithmetic error caused the "total selling price" to be $12,645.00, or $10 less.

> Order. THIS ORDER COMPROMISES [sic] THE ENTIRE
> AGREEMENT AFFECTING THE PURCHASE.

Id. The Spot Delivery Agreement includes the following language:

> 2. In the event that financing is not obtained from a third party
> for my purchase of this vehicle or the Dealership is unable to
> assign the Retail Installment Contract to a third party within 0
> days, I will return the vehicle to the Dealership or I may pay the
> Dealership the balance due as reflected in the Buyers Order
> within 24 hours of receiving written or oral notice from the
> Dealership of the credit denial.

Ex. 8, ECF No. 2-2, at 30. The "0" is handwritten into a blank space on the form. Id. Executive

Auto did not obtain third party financing from Western Funding until June 17, 2023, fourteen

days this Spot Delivery Agreement was signed. Compl., ECF No. 2, at ¶ 19. Executive Auto

failed to notify Juarez if the Retail Installment Contract was not assigned to a third party within

zero days. Id. at ¶ 18. After signing these documents and driving off with the Ford, Juarez's

"role in the transaction involving his own vehicle concluded." Id. at ¶ 24.

At no point during the June 3, 2019, encounter—or, for that matter, at any point

afterward—did Executive Auto disclose the "true amount financed, the term for the financing,

or the percentage rate charged during the term financed." Id. at ¶ 26. Juarez claims that the

Spot Delivery Agreement failed to state that the Ford was delivered conditionally in all-caps;

that Kandi did not tell Juarez that the sale was conditional on financing; or that the Spot

Delivery Agreement created a condition precedent to creating a final contract. Id. at ¶¶ 39–41.

### B. Financing

On June 17, 2019, Executive Auto allegedly submitted forged documents to Western

Funding, including: a second Buyer's Order ("June 17 Buyer's Order"), Ex. 10, ECF No. 2-2,

at 33–35; credit application, Ex. 9, ECF No. 2-2, at 31–32; Odometer Disclosure Statement,

Ex. 12, ECF No. 2-2, at 42; Retail Installment Sales Contract ("RISC"), Ex. 11, ECF No. 2-2, at 36–41; Western Funding First Payment Notice, Ex. 13, ECF No. 2-2, at 43; and Agreement to Provide Insurance, Ex. 14, ECF No. 2-2, at 44. Compl., ECF No. 2, at ¶¶ 25, 28, 34. Juarez claims that Executive Auto placed Juarez's electronic signature on these documents without his authorization or consent. Id. at ¶¶ 25, 28, 34. Juarez was only able to locate pages four and five in Executive Auto's records—the first three pages remain missing. Compl., ECF No. 2, at ¶ 25.

These June 17 documents—created without Juarez's involvement—differ in important respects from the June 3 documents. Where the June 3 Buyer's Order reflects a sale price of $12,360.00, Ex. 2, ECF No. 2-2, at 4, the June 17 Buyer's Order increases the sale price to $13,000.00, Ex. 10, No. 2-2, at 33. Likewise, the state sales tax jumps from $524.77 in the June 3 Buyer's Order to $551.74 in the June 17 Buyer's Order. Ex. 2, ECF No. 2-2, at 4; Ex. 10, No. 2-2, at 33. Juarez's down payment inexplicably decreases between the two documents, from $3,300.00 on June 3 to $2,400.00 on June 17. Ex. 2, ECF No. 2-2, at 4; Ex. 10, No. 2-2, at 33. Along with other minor discrepancies in license, title, and registration fees, these changes lead Juarez's purported unpaid balance to grow from $9,928.77 on June 3 to $11,515.74 on June 17. Ex. 2, ECF No. 2-2, at 4; Ex. 10, No. 2-2, at 33.

This inflated unpaid balance—$11,515.74—then became the amount financed in the allegedly fraudulent loan application, Ex. 9, ECF No. 2-2, at 31, and RISC, Ex. 11, ECF No. 2-2, at 36–41. The loan application and RISC also feature a 24.99% interest rate, and the RISC states that the financing ultimately involves a $8,317.41 finance charge. All told, the RISC

states that Juarez will pay $19,833.15 in principal and interest, for a total sale price of $22,233.15 including the reduced down payment of $2,400.00. Ex. 11, ECF No. 2-2, at 36–41.

The RISC was officially assigned to Western Funding on June 17, 2019. Compl., ECF No. 2, at ¶ 33. The document contains language binding Western Funding—as the holder of the consumer credit contract—to all claims and defenses that Juarez could assert against Executive Auto. Id. at ¶ 32 (citing Ex. 11, ECF No. 2-2, at 40).

Either Western Funding or Executive Auto created a Deal Jacket on June 17, 2019, which informs Executive Auto that the loan was approved and that their upfront check was $9,240. Ex. 15, ECF No. 2-2, at 45.

On June 18, 2019, Western Funding sent a "Funding Notification" message to Executive Auto requesting a copy of the title and lien receipt for funds to be released. Ex. 16, ECF No. 2-2, at 46. Juarez claims that Executive Auto did so, sharing the original documents that included the signatures dated June 3. Compl., ECF No. 2-2, at ¶ 37. Despite the earlier dates and attestation that the sales price was $12,350.00 instead of $13,000.00, Western Funding accepted these documents without objection. Id. at ¶¶ 37–38.

Juarez did not receive documents or disclosures related to the financing of the Ford until the end of 2021. Id. at ¶ 21–23.

### C. Payment and Repossession

When Juarez left Executive Auto on June 3, 2019, he believed he had purchased the Ford for the terms laid out in the June 3 Buyer's Order and Certificate of Title and Registration. Compl., ECF No. 2, at ¶ 42. Juarez made payments of $347.95 per month in 2019, 2020, and 2021, though he often experienced difficulty communicating with Western

Funding due to a language barrier. Id. at ¶¶ 43–44, 55. At one point, Juarez asked Western Funding to explain why his balance was not decreasing despite several years of payments. Id. at ¶ 46. Western Funding responded, in effect, that Juarez had got what he bargained for. Id.

In July 2021, Juarez lost work and had difficulty making payments to Western Funding. Id. at ¶ 47. On August 26, 2021, Western Funding sent Juarez a default notice stating that $696.60 was due on the loan, and the balance of the loan was $10,188.01. Id. at ¶ 48. While Plaintiff tried to arrange payment over the phone, he was unsuccessful. Id. at ¶ 49. After losing the truck, Juarez experienced "significant depression as a result of what he viewed as a humiliating experience." Id. at ¶ 55.

Western Funding repossessed the Ford on September 17, 2021, and sold it on September 30, 2021. Id. at ¶ 50. On October 29, 2021, Western Funding mailed Juarez a notice stating that the private sale yielded $3,984.00 of the balance of $10,547.93, leaving a deficiency of $6,798.93. Id. at ¶ 51. Juarez then visited Executive Auto and requested his original loan documents. Id. at ¶ 52. Executive Auto gave Juarez a "Dealer Track Plate and Auto Full List," which reflected the lower sales price and sales tax amounts agreed to on June 3, 2019, and told Juarez this was the only document they had. Id. at ¶ 53. After Juarez obtained counsel, Executive Auto shared additional documents. Id. at ¶ 56–57. It was only in February 2022, after this request through counsel, that Juarez saw the financing documents. Id. at ¶ 57.

While exact records are not available, Juarez believes he paid the $3,300.00 down payment to Executive Auto and $347.95 per month for twenty-four months—a total of $8.350.80—to Western Funding. Id. at ¶ 59. Juarez still owes Western Funding $6,978.93. Id. at ¶ 61.

On April 26, 2023, Judge Hoppe permitted Timothy R. Johnson to withdraw as counsel for Executive Auto due to a conflict of interest and a breakdown in communication. ECF No. 41.[3] Judge Hoppe instructed Executive Auto—an LLC—to retain counsel within fourteen days of his order. Id. Executive Auto has failed to do so. Citing this failure, Juarez filed a Motion to Show Cause and for Sanctions. ECF No. 42. The court ordered Executive Auto to respond to this motion, ECF No. 43, which Executive Auto ignored. The court then granted the motion to show cause, ECF No. 45, again receiving no response. Juarez moved for default judgment. ECF No. 44. On August 24, 2023, the clerk entered default against Executive Auto. ECF No. 46.

## II.

Federal Rule of Civil Procedure 55 "authorizes the entry of a default judgment when a defendant fails 'to plead or otherwise defend' in accordance with the Rules." United States v. Moradi, 673 F.2d 725, 727 (4th Cir. 1982). The Federal Rules create a two-step process for entry of default judgment. First, the non-defaulting party must move for entry of default under Rule 55(a). See Fed. R. Civ. P. 55(a). "The Clerk of the Court's interlocutory entry of default pursuant to Federal Rule of Civil Procedure 55(a) provides notice to the defaulting party prior to the entry of default judgment by the court." Hummel v. Hall, 868 F. Supp. 2d 543, 547 (W.D. Va. 2012) (citing Carbon Fuel Co. v. USX Corp., 1998 WL 480809, at *2 (4th Cir. Aug. 6, 1998)). Once default has been entered, the non-defaulting party may then move for entry of default judgment under Rule 55(b). Id. "If the plaintiff's claim is for a sum certain or a sum

---

[3] Johnson had previously served as counsel for both defendants in this matter but had withdrawn from representing Western Funding prior to Judge Hoppe's order.

that can be made certain by computation, the clerk—on the plaintiff's request, with an affidavit showing the amount due—must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing . . . ." Fed. R. Civ. P. 55(b)(1). However, "[i]n circumstances where the sum is not certain or where there is evidence to suggest that the defendant was incompetent or an infant, Rule 55(b)(2) applies, requiring that default can only be [made] by a court." Agri-Supply Co., Inc. v. Agrisupply.Com, 457 F. Supp. 2d 660, 662 (E.D. Va. 2006).

"Upon the entry of default, the defaulted party is deemed to have admitted all well-pleaded allegations of fact contained in the complaint," J & J Sports Prods., Inc. v. Romenski, 845 F. Supp. 2d 703, 706 (W.D.N.C. 2012), but not any such "allegations as to damages." S.E.C. v. Lawbaugh, 359 F. Supp. 2d 418, 422 (D. Md. 2005); Fed. R. Civ. P. 8(b)(6). Therefore, "to determine whether to enter judgment on a defendant's default, the court examines whether the well-pleaded allegations in the complaint support the relief sought in the case." Old Dominion Freight Line, Inc. v. Slabway, LLC, No. 1:22CV164, 2023 WL 2503310, at *1 (M.D.N.C. Mar. 13, 2023) (citing Ryan v. Homecomings Fin. Network, 253 F.3d 778, 780 (4th Cir. 2001). The pleadings must contain a "sufficient basis" for the judgment entered. Nishimatsu Const. Co. v. Houston Nat. Bank, 515 F.2d 1200, 1206 (5th Cir. 1975). If there is a sufficient basis for the judgment, then the court "must make an independent determination regarding damages," Lawbaugh, 359 F. Supp. 2d at 422, "relying on affidavits or documentary evidence in the record," Old Dominion Freight Line, Inc. v. Slabway, LLC, No. 1:22CV164, 2023 WL 2503310, at *1 (M.D.N.C. Mar. 13, 2023).

8

Corporations, unlike natural persons, may not proceed <u>pro se</u> in federal court. <u>See</u> <u>Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council</u>, 506 U.S. 194, 201–02 (1993) (noting long-held precedent that corporations must appear "only through licensed counsel"). Therefore, "a court may, after warning the corporate defendant of the consequences of not obtaining counsel and permitting the corporate defendant reasonable time to obtain counsel, enter a default and a default judgment against the unrepresented corporation." <u>KCA Penland</u> <u>Holdings Corp. v. Great Lakes Directional Drilling, Inc.</u>, 5:14-CV-175-RLV-DCK, 2017 WL 812479, at *2 (W.D.N.C. March 1, 2017).

Four of Juarez's six claims are against Executive Auto: (A) Failure to provide notice or secure financing under the Virginia Consumer Protection Act ("VCPA"); (B) Misrepresentations in violation of the VCPA; (C) Fraud; and (D) Constructive Fraud.

### A. VCPA: Failure to Provide Notice or Secure Financing

In Claim One, Juarez asserts that Executive Auto did not provide a legally required notice and that Executive Auto engaged in deceptive practices in violation of the VCPA.

The facts do not support Juarez's claim that Executive Auto failed to comply with the notice requirements under Va. Code Ann. § 46.2-1530(A)(12). This notice provision states:

> A. . . . A buyer's order shall include: . . . 12. If the dealer delivers to the customer a vehicle purchased by the customer on or after July 1, 2010, that is conditional on dealer-arranged financing, the following notice, printed in bold type no less than 10 point: "IF YOU ARE FINANCING THIS VEHICLE, PLEASE READ THIS NOTICE: YOU ARE PROPOSING TO ENTER INTO A RETAIL INSTALLMENT SALES CONTRACT WITH THE DEALER. PART OF YOUR CONTRACT INVOLVES FINANCING THE PURCHASE OF YOUR VEHICLE. IF YOU ARE FINANCING THIS VEHICLE AND THE DEALER INTENDS TO TRANSFER YOUR FINANCING TO A FINANCE PROVIDER SUCH AS A BANK, CREDIT

UNION OR OTHER LENDER, YOUR VEHICLE PURCHASE DEPENDS ON THE FINANCE PROVIDER'S APPROVAL OF YOUR PROPOSED RETAIL INSTALLMENT SALES CONTRACT. IF YOUR RETAIL INSTALLMENT SALES CONTRACT IS APPROVED WITHOUT A CHANGE THAT INCREASES THE COST OR RISK TO YOU OR THE DEALER, YOUR PURCHASE CANNOT BE CANCELLED. IF YOUR RETAIL INSTALLMENT SALES CONTRACT IS NOT APPROVED, THE DEALER WILL NOTIFY YOU VERBALLY OR IN WRITING. YOU CAN THEN DECIDE TO PAY FOR THE VEHICLE IN SOME OTHER WAY OR YOU OR THE DEALER CAN CANCEL YOUR PURCHASE. IF THE SALE IS CANCELLED, YOU NEED TO RETURN THE VEHICLE TO THE DEALER WITHIN 24 HOURS OF VERBAL OR WRITTEN NOTICE IN THE SAME CONDITION IT WAS GIVEN TO YOU, EXCEPT FOR NORMAL WEAR AND TEAR. ANY DOWN PAYMENT OR TRADE-IN YOU GAVE THE DEALER WILL BE RETURNED TO YOU. IF YOU DO NOT RETURN THE VEHICLE WITHIN 24 HOURS OF VERBAL OR WRITTEN NOTICE OF CANCELLATION, THE DEALER MAY LOCATE THE VEHICLE AND TAKE IT BACK WITHOUT FURTHER NOTICE TO YOU AS LONG AS THE DEALER FOLLOWS THE LAW AND DOES NOT CAUSE A BREACH OF THE PEACE WHEN TAKING THE VEHICLE BACK. IF THE DEALER DOES NOT RETURN YOUR DOWN PAYMENT AND ANY TRADE-IN WHEN THE DEALER GETS THE VEHICLE BACK IN THE SAME CONDITION IT WAS GIVEN TO YOU, EXCEPT FOR NORMAL WEAR AND TEAR, THE DEALER MAY BE LIABLE TO YOU UNDER THE VIRGINIA CONSUMER PROTECTION ACT."

Va. Code Ann. § 46.2-1530(A)(12).

It is true that this notice does not appear in the Spot Delivery Agreement, Ex. 8, ECF No. 2-2, at 30. However, Va. Code § 46.2-1530(A) specifically applies to buyer's orders, not spot delivery agreements, and this notice does appear in the June 3 Buyer's Order, Ex. 2, ECF No. 2-2, at 5–6, which Juarez acknowledges signing.

The facts support Juarez's second VCPA claim, that Executive Auto engaged in deception or made misrepresentations in connection with this transaction in violation of Va. Code § 59.1-200(A)(14) (prohibiting "any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction"). Compl., ECF No. 2, at ¶ 69. Changing the terms of the transaction, failing to disclose those changes or the financing conditions, and forging documents to obtain financing is deceptive conduct within the meaning of Va. Code § 59.1-200(A)(14), for which Executive Auto is liable.

The court may award treble damages for willful VCPA violations. Va. Code. § 59.1-204(A); Johnson v. Robert Shields Interiors, Inc., No. 1:15CV820, 2016 WL 2739270, at *9 (E.D. Va. May 11, 2016) (awarding treble damages in the context of a default judgment). Here, Executive Auto's violation cannot be anything but willful. The VCPA provides that successful claimants "may be awarded reasonable attorneys' fees and court costs." Va. Code § 59.1-204(B); Kelley v. Little Charlie's Auto Sales, No. 4:04CV00083, 2006 WL 2456355, at *2, *4–5 (W.D. Va. Aug. 22, 2006) (awarding attorney's fees for the portion of work attributable to the VCPA claim).

Furthermore, "[u]nder the Supreme Court of Virginia's definition of 'actual damages,' . . . the VCPA authorized recovery for emotional distress." Barnette v. Brook Rd., Inc., 429 F. Supp. 2d 741, 752 (E.D. Va. 2006).

> The VCPA allows a plaintiff to recover "actual damages" resulting from VCPA violations. [Va. Code § 59.1–204.] Under Virginia law, "actual damages" include all "damages in satisfaction of, or in recompense for, loss or injury sustained," "all loss recoverable as a matter of right," and "all damages other than punitive or exemplary damages." [News Leader Co. v. Kocen, 173 Va. 95, 108, 3 S.E.2d 385, 391 (1995) (quotations and

citations omitted).] Put simply, actual damages compensate injured parties.

Two circuit courts, however, have ruled that under the VCPA, "actual damages" means economic damages. [Deane v. Novacare Orthotics, 50 Va. Cir. 418 (Rockbridge Co. 1999); Devonshire v. Eurapair Int'l, 40 Va. Cir. 149 (Fairfax Co. 1996).] Reversing course, one of those courts later took the position that " 'actual damages' as used in the VCPA is not limited to out-of-pocket pecuniary losses." [Humphrey v. Leewood Healthcare Ctr., 73 Va. Cir. 346 (Fairfax Co. 2007).] This Court finds the reasoning of that later decision persuasive and presumes that "in the absence of limiting language, the General Assembly intended no unusual restriction on the term 'actual damages' as used in the VCPA." [Id. at 349; see also Barnette v. Brooke Rd., Inc., 429 F. Supp. 2d 741 (E.D. Va. 2006) ("Had the General Assembly intended to limit 'actual damages' to economic damages or out-of-pocket expenses, thereby altering the existing court definition, it must have done so expressly.")]

Wingate v. Insight Health Corp., 87 Va. Cir. 227, 2013 WL 9564175, at *8 (Oct. 31, 2013).

Juarez submitted an affidavit in support of his motion for default judgment that identifies the damages he seeks. Aff., ECF No. 44-1, at 1. Juarez claims that his actual damages are $18,629.73. Compl., ECF No. 2, at ¶ 74. He also seeks $10,000 in emotional distress damages and $5,000 in consequential damages "which represents the harm caused to [his] credit rating caused by Executive Auto's fraud." Aff., ECF No. 44-1, at 1. Juarez further requests $20,322 in attorney's fees.[4] Revised Aff., ECF No. 61, at 1.

---

[4] Juarez initially submitted an affidavit in support of his request for an award of attorney's fees in which he attributed half of all attorney's fees incurred to Executive Auto. Aff., ECF No. 44-1, at 1. The court explained that the tasks counsel performed could not be split evenly between the two defendants and ordered her to submit a revised affidavit that identified the tasks attributable to Executive Auto, Western Funding, or both. Order, ECF No. 60. Counsel submitted this revised affidavit on December 11, 2023, which attributed her tasks to either one or both of the defendants. Revised Aff., ECF No. 61.

Juarez has succeeded in alleging that the VCPA violations were willful. Virginia law makes clear that, in such a scenario, a plaintiff is entitled to treble damages for economic and emotional harm, as well as reasonable costs and attorney's fees. Juarez asserts $18,629.73 in economic harm, $10,000 in emotional harm, and $5,000 in consequential damages from damage to his credit, for a total claim of $33,629.73. Aff., ECF No. 44-1, at 1. Trebled, Juarez's actual damages total $100,889.19. Juarez also seeks $20,322 in attorney's fees. Thus, Juarez is entitled to an award of $100,889.19 and recovery of $20,322 in attorney's fees.

## B. VCPA: General Misrepresentations

Claim Two is similar to Claim One, in that it relies on the catchall prohibition in Va. Code § 59.1-200(A)(14) on "any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Juarez pleads that Executive Auto violated this provision by making a number of misrepresentations in connection with the car purchase and financing, specifically: submitting documents to the DMV reflecting one sales price and sales tax, and submitting documents to Western Funding with different figures; misrepresenting that the Western Funding lien was created on June 3, 2019; stating that the June 3 Buyer's Order was the full agreement of the parties, and then submitting a different agreement to Western Funding; forging Juarez's e-signature on various documents; misrepresenting the down payment as $2,400 instead of $3,300; and falsely claiming to have no documents other than the Dealer Track Plate & Auto List when Juarez sought his paperwork in 2021. Compl., ECF No. 2, at ¶ 78.

Juarez's evidence plainly supports the general VCPA misrepresentations he asserts. However, his damages under this claim are duplicative of those he recovered under his first claim, so regardless of his success on this claim, Juarez cannot obtain a duplicate recovery.

### C. Fraud

In Virginia, "[a] party alleging fraud must prove by clear and convincing evidence (1) a false representation, (2) of material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him." Van Deusen v. Snead, 247 Va. 324, 327, 441 S.E.2d 207, 209 (1994) (quoting Thompson v. Bacon, 245 Va. 107, 111, 425 S.E.2d 512, 514 (1993)). A plaintiff alleging fraud "must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); see also Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (citations omitted) ("[T]he circumstances required to be pled with particularity under Rule 9(b) are the time, place, and contents of the false representations, as well as the identity of the person making the representation and what he obtained thereby.").

Juarez successfully alleges fraud in this case, as he pleads that Executive Auto made a variety of misrepresentations so that Juarez would sign the June 3 Buyer's Order and Spot Delivery Agreement "and be obligated to pay the amounts as set forth in the 6/17/2019 deal, which was founded on forged electronic documents that set forth terms universally worse for [Juarez] than the terms disclosed to [Juarez]" on June 3. Compl., ECF No. 2, at ¶ 84. Juarez relied on these misrepresentations by signing the paperwork, paying a $3,300 down payment,

and subsequently paying Western Funding monthly. Id. at ¶ 86. The terms of the June 17 Buyer's Order and RISC were materially worse for Juarez, causing him harm.

Again, Juarez recovered the full extent of his damages under his first claim. He is not entitled to an additional award under this claim.

### D. Constructive Fraud

In Virginia, "the elements of a cause of action for constructive fraud are a showing by clear and convincing evidence that a false representation of a material fact was made innocently or negligently, and the injured party was damaged as a result of his reliance upon the misrepresentation." Mortarino v. Consultant Eng'g Servs., Inc., 251 Va. 289, 295, 467 S.E.2d 778, 782 (1996). "Constructive fraud differs from actual fraud in that the misrepresentation of material fact is not made with the intent to mislead but is made innocently or negligently although resulting in damage to the one relying on it." Cohn v. Knowledge Connections, Inc., 266 Va. 362, 369, 585 S.E.2d 578, 582 (2003) (emphasis in original) (quoting Evaluation Rsch. Corp. v. Alequin, 247 Va. 143, 148, 439 S.E.2d 387, 390 (1994)). As above, at common law tortfeasors are jointly and severally liable for their conduct. Weaver, 165 F.2d at 865.

Although the facts support Juarez's claim for constructive fraud, "a contemporaneous finding of liability on [this] alternative claim[] would amount to awarding Plaintiff a double recovery." CMA CGM S.A. v. Dubitec Am., Inc., No. 2:14CV608, 2015 WL 5837571, at *4 (E.D. Va. Oct. 2, 2015). Therefore, no additional damages are awarded on this claim.

## III.

For the reasons stated above, Juarez's motion for default judgment is **GRANTED**. The court awards Juarez $100,889.19 in treble damages and $20,322 in attorney's fees. An appropriate order shall issue.

Entered: January 18, 2024

Michael F. Urbanski
Chief United States District Judge